**SIGNED THIS: February 5, 2021**

_Thomas L. Perkins_

—————————————————————

**Thomas L. Perkins**
**United States Chief Bankruptcy Judge**

—————————————————————————————

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **KEVIN J. McCLURE,** | ) | **Case No. 18-81446** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| **LISA KYLE-WOLF,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adv. No. 19-8058** |
| | ) | |
| **KEVIN J. McCLURE,** | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

This matter is before the Court after trial on the adversary complaint filed by the Plaintiff,

Lisa Kyle-Wolf, against the Defendant and Debtor, Kevin J. McClure, seeking a determination

that a certain unliquidated debt is nondischargeable under Section §523(a)(2)(A) as arising out of

a fraud committed after the Plaintiff joined the Debtor in his counseling business. The fraud alleged in the complaint is that the Debtor fraudulently induced the Plaintiff to incur liability as a co-maker on a $50,000 business loan by falsely promising her that (1) the funds would be used to pay her salary and to grow the business, and (2) she would be made a co-owner of the business. Because the evidence failed to prove that the Debtor made false statements or was engaging in a fraudulent scheme, the Debtor is entitled to judgment in his favor.

**Factual Background**

Debtor was sole owner and president of Aeon Social Emotional Health Ltd. (Aeon), an Illinois company he incorporated in 2010 that offered personal counseling services. Plaintiff, a licensed clinical social worker, first met the Debtor when they both were working for the same private practice counseling agency in the 2000's and over the years they stayed in contact. In 2016, while Plaintiff was working for a company that provided counseling services to prison inmates, she contacted the Debtor to inquire about an arrangement where she could see private clients in his offices at Aeon. They agreed that from the per hour fee paid by the client to Aeon, the Plaintiff would be paid $50 an hour. In late 2016, Plaintiff began working part-time at Aeon under this arrangement, while also still working at the correctional facility.

After a few months as a part-time counselor with Aeon, the Plaintiff was regularly seeing ten clients a week who were paying Aeon a minimum of $100 per hour.  In April 2017, Plaintiff quit her job at the correctional facility and began working at Aeon full time. In May 2017, the Debtor raised with Plaintiff the idea that a business development loan could be obtained to enable Aeon to pay her a full-time salary while she built up her business and also that he would consider allowing her to purchase a minority ownership interest in the business. A follow-up conversation occurred in June 2017 at which time the Debtor told her that he was unable to

obtain a loan on his own credit and she would need to co-sign the loan. The Plaintiff agreed to do so.

Shortly thereafter, a $50,000 loan was applied for and approved by Justine Petersen Housing and Reinvestment Corporation (Peterson) and Great Rivers Community Capital (GRCC), a subsidiary of Peterson. As structured, the loan was to be made not to Aeon but to the Debtor and the Plaintiff individually as co-makers, with the Debtor granting a mortgage on his personal residence as collateral. The loan closed on August 8, 2017 and the loan proceeds of $50,000 were deposited in Aeon's business account at Heartland Bank, controlled solely by the Debtor, even though the Plaintiff had requested that the funds be held in a separate account. The total loan amount, including expenses and fees paid at closing, was $53,188, with interest to accrue at 12%, payable in monthly installments of $1,051.08. On August 8, 2017, an Automatic Payment Plan Authorization Request was completed authorizing automatic debits from Aeon's account at Heartland Bank to Peterson for monthly payments of $1,051.08 to start on September 15, 2017.

At some unspecified point during 2017, the Debtor took a full-time position with Illinois State University and stopped taking new counseling clients, while continuing to manage Aeon's business. According to the Debtor, in the months after the loan he was struggling to keep Aeon afloat. Debtor spent the entire loan proceeds of $50,000 within five months and at the end of December 2017, the Debtor closed the business. The Debtor filed a Chapter 7 bankruptcy petition on September 25, 2018 and received a general discharge on December 28, 2018. The Plaintiff was not scheduled as a creditor or a co-debtor and did not receive notice of the bankruptcy before the discharge was entered. The Debtor stated in his Answer to the Complaint that Plaintiff was not listed as a creditor because he believed she was only owed wages by Aeon

and was not aware of an alleged claim against him personally. In March 2019, GRCC notified the Plaintiff that the loan was in default and demanded that Plaintiff take over the payments. The Plaintiff negotiated an agreement with GRCC to assume responsibility for paying the note in installments of $400 per month.

Plaintiff filed her adversary complaint against the Debtor seeking a nondischargeability determination as to the Debtor's liability to GRCC on the note and entry of a money judgment against him in the amount of $50,000. The Plaintiff alleges that the Debtor falsely promised her an ownership stake in Aeon that was never conveyed and that the loan would be used in part to pay Plaintiff's salary and in part to help grow the business. Plaintiff contends that she signed the GRCC note in reliance upon these promises. She maintains that the Debtor fraudulently induced her to agree to co-sign the loan with GRCC because he had no intention of using the loan proceeds to fund or otherwise build the business of Aeon or pay the Plaintiff's salary and that he never intended to make her a part owner.

The main factual controversy lies in what was promised to the Plaintiff in return for co-signing the loan. Plaintiff contends that Debtor agreed to give her a 45% ownership interest in Aeon, pay her a $6,000 monthly salary, and that half the loan proceeds would be segregated and used to pay the Plaintiff's salary. Plaintiff stated in her testimony that she was only paid $5,000 per month from September 2017 through November 2017. Debtor conceded in his testimony that he agreed to pay her a salary of $6,000 per month and that 50% of the loan proceeds would be reserved for that purpose. In his view, however, the salary obligation to Plaintiff was undertaken by Aeon and not the Debtor personally. Debtor contends that there was no firm agreement or time frame for Plaintiff to receive stock in Aeon, which was conditioned on the future profitability of the business. The Plaintiff also contends that some of the money from the loan

was used by the Debtor for personal expenses and debts, rather than legitimate business expenses, including a trip to Florida with his children.

**Analysis**

The determination of dischargeability of a debt involves a two-step process: (1) the establishment of a valid prepetition debt owed by the debtor under applicable non-bankruptcy law and (2) a determination whether the debt is nondischargeable under section 523(a) of the Bankruptcy Code. *In re Trovato,* 145 B.R. 575, 579 (Bankr. N.D. Ill. 1991) (citing *Grogan v. Garner,* 498 U.S. 279 (1991)). A prepetition judgment evidencing the debt would satisfy the first step. Where a creditor brings a dischargeability action in bankruptcy court without having first obtained a judgment in a non-bankruptcy forum, unless abstention would be appropriate to allow an action pending in another forum to proceed, the bankruptcy court must determine the existence and amount of the debt as a matter of non-bankruptcy law. *In re Valle,* 469 B.R. 35, 43 (Bankr. D. Idaho 2012). Section 523(a)(2) does not provide a creditor with a cause of action that "simultaneously creates a debt and renders it non-dischargeable." *In re Vanwinkle,* 562 B.R. 671, 678 (Bankr. E.D. Ky. 2016).

Bankruptcy courts have both subject matter jurisdiction and constitutional authority to adjudicate state law claims as part of a dischargeability proceeding. *In re Miller,* 589 B.R. 550, 561 (Bankr. S.D. Miss. 2018). The validity of a creditor's claim is determined by the rules that define and apply to the cause of action under non-bankruptcy (usually state) law, including the burden of proof. *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20-21 (2000); *Grogan v. Garner,* 498 U.S. 279, 283-85 (1991). If the plaintiff fails to establish the existence of a valid debt under non-bankruptcy law, the analysis ends without consideration of §523(a) and the defendant is entitled to judgment.

As pointed out by the Supreme Court in *Grogan v. Garner,* where a creditor brings a complaint under §523(a)(2)(A) alleging a cause of action for fraud under state law, it should be considered whether the debtor is liable to the creditor on other grounds, apart from the fraud claim. Section 523(a)(2)(A) applies not only to a state law fraud claim but may also apply to a contract or other transactional liability, as long as it is a debt "for money, property, services, … to the extent obtained by false pretenses, a false representation or actual fraud." The distinction between claims is especially important where the fraud cause of action under state law imposes upon the creditor a "clear and convincing" burden of proof. Even if such a creditor is unable to establish a debt for fraud under state law, she may yet hold a claim for a separate debt, provable by a preponderance of the evidence and arising out of the same transaction, that is itself actionable under §523(a)(2)(A). See *Grogan v. Garner,* 498 U.S. 279, at 284-85 and n.12 (acknowledging the alternative path for a creditor unable to prove fraud by clear and convincing evidence "but who nonetheless established a valid claim by proving, for example, a breach of contract involving the same transaction.").

The Plaintiff does not hold a prepetition judgment against the Debtor. The single cause of action alleged in the Plaintiff's adversary complaint against the Debtor is one for the tort of fraudulent inducement. Fraudulent inducement is a form of common law fraud recognized by the courts of Illinois. *Mann v. Kemper Financial Cos.,* 247 Ill.App.3d 966, 979 (1992). To prove such a claim a plaintiff must show (1) a false statement of material fact by the defendant, (2) knowledge or belief by the defendant that the statement was false, (3) that the defendant intended to induce the plaintiff to act, (4) the plaintiff's reasonable reliance upon the truth of the statement, and (5) damage to the plaintiff resulting from this reliance. *Avon Hardware Co. v. Ace Hardware Corp.,* 2013 IL App (1st) 130750, ¶ 15. The false statement must be a statement of

fact, not an expression of opinion. *Id.* ¶ 17. Misrepresentations of intent to perform future

conduct, even if made without the present intention to perform, generally are not actionable as

fraud in Illinois. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 168

(1989). An exception exists, however, where the false promises are alleged to be the scheme or

device employed to perpetrate the fraud. *Id.* In common law fraud actions under Illinois law, the

fraud must be proved by clear and convincing evidence. *Avery v. State Farm Mut. Auto. Ins. Co.,*

216 Ill.2d 100, 191-92 (2005).

      For a fraudulent inducement claim involving one's personal liability on a promissory

note, payable in the future and thus not liquidated, the proper form of relief would be judgment

for the defendant to indemnify and reimburse the plaintiff for all amounts paid or to be paid on

the note. The liability to indemnify the plaintiff, even if partially or fully contingent, is a debt

owed by the defendant to the plaintiff that could be excepted from discharge. The Plaintiff's

request in the complaint's prayer for relief for a judgment declaring the Debtor's liability to

GRCC nondischargeable would not have been an appropriate remedy.

      In the alternative to fraudulent inducement, a separate obligation owed by the Debtor to

the Plaintiff arises out of the same transaction based upon the undisputed fact that they executed

the promissory note to GRCC as co-makers. By its terms, the note is governed by Missouri law.

Under Article 3 of the Uniform Commercial Code as enacted in Missouri, co-makers are jointly

and severally liable and "a party having joint and several liability that pays the instrument is

entitled to receive from any party having the same joint and several liability contribution in

accordance with applicable law." Mo.Rev.Stat. § 400.3—116 (2000). That section gives each co-

maker to a note the right to contribution from the other to the extent they pay more than their

proportionate share. *Risch v. Risch,* 72 S.W.3d 274, 279 (Mo. App. S.D. 2002). Where

appropriate, equitable considerations may be used to award contribution in an amount more or less than that which is strictly proportional. *In re Estate of Wray,* 842 S.W.2d 211, 214 (Mo. App. E.D. 1992).

Although not expressly pleaded by the Plaintiff in her complaint, the right of contribution between co-makers arises by operation of law. The note was admitted into evidence at trial and the Debtor admitted signing the note as a co-maker with the Plaintiff. In the Court's view, the Debtor's failure to list the Plaintiff as a Codebtor on Schedule H and on Schedule E/F as holding a contingent claim for contribution against him was error, and may have contributed to the Plaintiff's failure to recognize and assert this alternative debt in the adversary complaint. Nevertheless, the contribution claim is a contingent prepetition debt arising out of the same transaction alleged to have been fraudulent and the debt's validity is established as a matter of Missouri law applied to the undisputed evidence in the record at trial. Under these circumstances, the Court will consider the contribution claim as an alternative debt actionable under §523(a)(2)(A).

Unlike the fraudulent inducement claim, the contribution debt, although contingent, is already established as a matter of non-bankruptcy (Missouri) law. The analysis thus proceeds directly to §523(a)(2)(A). Under that section, in order for the creditor to except a debt from discharge on the basis of false statements or fraud, the creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied. *Ojeda v. Goldberg,* 599 F.3d 712, 716-17 (7th Cir. 2010). Once those elements are established, the creditor must then prove a loss proximately caused by her justifiable reliance. *Id.* at 721. Ordinarily, to be actionable under §523(a)(2)(A), a false

representation must concern a present or past fact. Where the representation is a promise to

perform an act in the future, the subsequent failure to perform is not enough to prove the promise

was fraudulent; rather, it must be shown that the debtor did not intend to perform at the time the

promise was made. *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (7th Cir. 1997); *In re Alomari,*

486 B.R. 904, 911-12 (Bankr. N.D. Ill. 2013). The standard of proof for dischargeability

exceptions under §523(a) is the ordinary preponderance of the evidence standard. *Grogan v.*

*Garner,* 498 U.S. 279 (1991).

Based on the foregoing, this case presents an unusual situation requiring two analyses of

the same evidence under somewhat different standards. The claim under Illinois law for

fraudulent inducement must be evaluated using a standard of reasonable reliance and a clear and

convincing standard of proof. The contribution debt is evaluated using established principles

under §523(a)(2)(A) that apply justifiable reliance and proof by a preponderance of the evidence.

As a preliminary issue, the Debtor raises as a matter of defense that the "subject debt is a

corporate debt, rather than a personal obligation." (Doc. 12, ¶ III. B). That the Debtor was acting

as owner and officer of Aeon is not a valid defense. "Although corporate officers generally are

not liable for the obligations of the corporation, they are personally liable to a victim of a tort for

damages resulting from their personal participation in the tort." *Mannion v. Stallings & Co., Inc.,*

204 Ill.App.3d 179, 191 (1st Dist. 1990). See, also, *Pretzel & Stouffer, Chartered v. Imperial*

*Adjusters, Inc.,* 28 F.3d 42, 46 (7th Cir. 1994) (agents are liable for their own torts). Since the

Debtor is alleged to have made the false promises, his status as owner and officer of Aeon is no

defense to personal liability.

Plaintiff's theory is summarized in the Complaint, alleging "the Defendant fraudulently

induced the Plaintiff to agree to co-sign the loan with Great Rivers Community Capital in that he

9

had no intention of using the proceeds therefrom to fund or otherwise build the business of Aeon or pay the Plaintiff's wages," (Doc. 1, ¶ 19), and that the Defendant "agreed to give the Plaintiff 45% ownership of Aeon," (Doc. 1, ¶ 7.b), but failed to do so. The Complaint further alleges that "the Defendant used the loan money to pay personal expenses and debts." (Doc.1, ¶ 20) Initially, the Plaintiff must prove, by clear and convincing evidence for the fraudulent inducement claim but merely by a preponderance for the contribution debt, that the alleged promises were made by the Debtor and were not fulfilled. Evidence that a promise made by the Debtor was kept would refute an inference that he made the promise with no intention to perform it.

Mary Rynearson, Aeon's office manager in 2016 and 2017, testified that the business regularly struggled to pay its bills, including the Plaintiff's wages. In 2017, she was present at several conversations with the Debtor and the Plaintiff in the office where they discussed the possibility of obtaining a business loan, with the funds to be held in a separate account, so that the Plaintiff could be paid a salary and money could be available to help the business grow. Ms. Rynearson testified that the Debtor was desirous of making sure the Plaintiff got paid after she quit her job at the prison. She recalled one conversation where the Debtor discussed having the Plaintiff buy into the business if she chose to. During the same conversation, the Debtor asked the Plaintiff to co-sign the loan. Ms. Rynearson testified that after August 2017, the Debtor became distant and difficult to deal with. The Debtor took the check-writing responsibilities away from her, so she had no knowledge of how the loan proceeds were used.

Vicky Ortega, the Plaintiff's spouse, testified about two conversations at which she was present. In May 2017, at Johnny's Steakhouse, the Debtor brought up the idea of obtaining a business loan that would provide a source of funding to pay the Plaintiff a salary while she built up her practice. He also raised the possibility that the Plaintiff could become a part-owner of the

business. In June 2017, during a conversation at the home of the Plaintiff and Ms. Ortega, the

Debtor and the Plaintiff again had a discussion about the loan, that a co-signer was needed, and

that the proceeds could be used to fund the Plaintiff's salary.

The Plaintiff, in her testimony, stated that she had a conversation with the Debtor in his

office in June 2017, where he told her that if she co-signed the loan, he would "give her 45% of

the business," and would pay her a salary of $6,000 per month. On the basis of these promises,

she agreed to co-sign the loan. She later had a conversation with the Debtor and Ms. Rynearson

about putting the loan proceeds in a separate account, but the Debtor was not happy about the

idea and "became defensive." Nevertheless, she believed he was willing to deposit the proceeds

in an account to be opened at CEFCU. When they went to CEFCU after the loan closing and

attempted to open the account, they were unable to do so for lack of the necessary "paperwork

for the business," so they were "forced" to deposit the check in Aeon's checking account at

Heartland Bank. She gave no further testimony that specifically referred to the Debtor's alleged

agreement to deposit the funds in a separate account. The Court concludes that the Plaintiff did

not raise that issue with the Debtor at any later time.

The Plaintiff testified that her hourly wages were paid current, if not always on time,

through July 2017. After the loan proceeds became available, she said that she received $5,000

per month through November, and that Ms. Rynearson had to sign the November check since the

Debtor was not around. The Plaintiff conceded that she knew Aeon could not afford to pay her a

monthly salary of $6,000 without the loan. When asked on cross-examination why she did not

have the Debtor's promises to her put in writing, she responded that she "trusted him."

The Debtor's testimony as to what he promised differs from the Plaintiff's testimony. He

admitted agreeing that once the loan was obtained, the Plaintiff was to be paid a monthly salary

of $6,000 and that half the loan proceeds would be allocated to her salary. The Debtor introduced

into evidence an Aeon W-2 indicating the Plaintiff was paid wages of $37,850 in 2017. The

Debtor testified that she was paid $2,500 per month prior to the loan and $6,000 per month

thereafter through November. According to the Debtor, the $6,000 was a gross amount from

which withholding taxes were deducted. He admits she was not paid for December 2017. He

stated the other half of the loan proceeds was to be used for regular business expenses and to

hopefully grow the business through advertising.

The Debtor stated the loan proceeds were completely spent by the end of the year. No

bank account records or other documents were produced, however, by either party, to quantify or

trace the expenditures. No evidence was offered as to whether the Debtor was receiving wages or

other distributions from Aeon during the last half of 2017 and, if so, how much. The Debtor

admitted taking a business trip to Florida in December for his other job and taking his kids to

Disney World. The Plaintiff contends he used the loan proceeds to pay for the trip, but this

contention was not established by the evidence. Neither was the contention that the Debtor was

using the loan proceeds to pay other personal expenses.

With respect to the alleged promise to make the Plaintiff a minority shareholder, the

Debtor stated unequivocally that his representations to the Plaintiff were always conditioned on

the business growing and becoming successful in the future, and were always framed as a buy-in

at a fair value price. In effect, he denied telling the Plaintiff that she would receive an ownership

interest solely in consideration for co-signing the loan.

The evidence concerning the two promises at issue – to pay Plaintiff a monthly salary of

$6,000 and to grant Plaintiff an ownership interest in Aeon – reveals a substantive difference that

affects the analysis. To be enforceable contractually, a promise must be sufficiently definite as to

its terms so that the promisor's obligations are clearly identifiable. *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1440-41 (7th Cir. 1992) (applying Illinois law). Statements that are vague or indefinite or are informal expressions of goodwill or hopes for the future, even if expressed as a promise, are unenforceable. *Id.* at 1441. For purposes of promissory estoppel, which, similar to fraud, provides a remedy for reliance upon promises that may not be contractually enforceable, there must nonetheless be a promise that is unambiguous as to its terms and with a requisite definiteness in order for reliance to be reasonable. *Nibeel v. McDonald's Corp.,* 1998 WL 547286, *11-12 (N.D. Ill.). The essence of promissory estoppel is that the plaintiff has reasonably relied on the defendant's promise as one intended as a legally enforceable commitment, "and not a mere prediction or aspiration or bit of puffery." *Garwood Packaging, Inc. v. Allen & Co., Inc.,* 378 F.3d 698, 705 (7th Cir. 2004).

The parties do not agree on what, exactly, was said by the Debtor concerning an ownership interest during conversations that occurred over several months. The Plaintiff interpreted the several conversations they had about it as resulting in a firm and definite promise to convey a 45% interest to her if she co-signed the loan. The Debtor denies making such a promise, contending that he did not commit to any such conveyance and was only agreeing to have future discussions and negotiations with the Plaintiff, if the business improved, about purchasing a minority interest for an amount to be determined. No writing of any kind was ever created to memorialize the promise. The Plaintiff never reviewed Aeon's books and records or requested any information in anticipation of acquiring an ownership interest. After considering all of the testimony, the Court concludes that the Debtor did not make a firm and definite commitment to make the Plaintiff a minority owner in exchange for her co-signing the loan, and

13

that the ownership suggestion was so vague, open-ended, lacking in terms and aspirational in nature, as to preclude any reasonable or even justifiable reliance by the Plaintiff.

The salary promise, however, was definite. The Debtor promised the Plaintiff, that if she co-signed the loan, Aeon would pay her a monthly salary of $6,000 and would reserve half the loan proceeds for that purpose, enough to cover four months of salary at that amount. While the Debtor may have also promised that the loan proceeds would be deposited in a separate account, as evidenced by the unsuccessful trip to CEFCU following the loan closing, the Court finds that element of the promise to have been relatively insignificant to the Plaintiff. She could have asked CEFCU to open an individual joint account, rather than a business account. There is no evidence she made that request and she never thereafter raised the issue with the Debtor. The Court further finds that the Plaintiff relied on the promise of a substantial salary increase as the basis for agreeing to co-sign the loan, and her reliance was reasonable and justifiable. In the Court's view, the promise of a monthly salary of $6,000 along with $25,000 of the loan proceeds reserved for that purpose, was sufficient by itself to induce the Plaintiff to co-sign the loan.

The Plaintiff must also prove, however, that the Debtor made the promise with an intent not to keep it. The fact that weighs most strongly against the Plaintiff, is that she did, in fact, receive the promised salary payment in September, October and November of 2017. She claims she only received $5,000 per month, while the Debtor says she was paid a gross amount of $6,000 and after tax deductions, received a net amount of closer to $5,000. No pay stubs or other records were offered in support of the issue. In the absence of any documentary evidence, which could have easily eliminated the uncertainty, the Court finds that the Plaintiff failed to prove that she received a gross amount of less than $6,000 for those three months. Her 2017 W-2 supports the conclusion that she was paid through November a total amount very close to eight monthly

14

payments of $2,500 and three payments of $6,000. Proof that a promisor carried out the promised action is circumstantial evidence of a non-fraudulent intent.

It is undisputed that the Debtor failed to personally write the salary check in November 2017, and that the Plaintiff had to request that Ms. Rynearson, who was still a signatory on the Heartland account, do so. The evidence showed that the Debtor was out of the office for an extended period in November and had little or no contact with the Plaintiff. While it is possible to infer that he was avoiding the Plaintiff so he wouldn't have to pay her, there was no evidence offered to corroborate this inference and it is equally plausible that his failure to write the check himself was the consequence of negligence rather than intent.

The fact that he subsequently expressed anger at Ms. Rynearson for writing the check is inconclusive. It is reasonable to infer that the Debtor was angry because Ms. Rynearson violated his express direction that she not have anything more to do with the business checking account. In addition, any contrary inference is outweighed by the fact that regardless of how he felt about it, sufficient funds were in the account to pay the Plaintiff her agreed salary in November. It is undisputed that the Debtor executed the Plaintiff's salary checks for September and October. The evidence establishes that the promise to pay the Plaintiff $6,000 per month was honored for the three months following the loan closing, which refutes the inference that the Debtor made the salary promise never intending to keep it. The probative value to the contrary of the Debtor's failure to pay the Plaintiff in December, is outweighed by the payments in September, October and November, which are closer in time to the August loan closing and thus better reflective of the Debtor's intent at that time.

Of great significance is the fact that the Debtor mortgaged his house to secure the loan, which is inconsistent with other inferences that could be drawn that the Debtor conned and

defrauded the Plaintiff into co-signing the loan so he could use the loan proceeds for his own

purposes. The Plaintiff had her suspicions but there was little evidence of actual misuse of

corporate funds and no bank records were offered that would have shown how the funds were

spent. Given the Debtor's mortgage, if he knew Aeon was doomed at the time of the loan

closing, or that he planned on misusing the loan funds for non-business purposes, then he

intentionally, and irrationally, put himself on a path of financial self-destruction. The evidence,

however, did not establish what the Debtor thought about Aeon's future at the time of the loan

closing in August 2017. Neither was there evidence offered that the Debtor had some animosity

toward or desire to harm the Plaintiff.  Nor did the evidence establish, or even suggest, that the

Debtor had some desperate need to obtain a large amount of money in or around August 2017,

that would have explained or given a motive for the alleged fraud. Since fraud is not to be

presumed, "if the motives and designs of a party charged with fraud may be traced to an honest

and legitimate source equally as well as to a corrupt one, the honest source must be preferred."

*Wolf v. Lawrence,* 276 Ill. 11, 19 (1916).

The Debtor's behavior was proved to be abnormal and even erratic during the latter part

of 2017. He actively avoided the Plaintiff. By November, he seemed to have given up trying to

keep Aeon afloat. The Debtor did not even attempt to explain why he would have borrowed

$50,000 in August, using the credit and liability of the Plaintiff, his long-time acquaintance and

business associate, and his own liability secured by a mortgage on his house, to obtain a business

development loan for Aeon, only to close the business a few months later before any benefit

from the funds could be realized. The close proximity between the time of the loan and the

closure of Aeon is certainly curious and begs an explanation, but none was offered. The

evidentiary record produced at trial does not exclude the possibility that the Debtor was

scamming the Plaintiff to get access to a portion of the loan money but it falls well short of proving that theory by clear and convincing evidence or even by a preponderance of the evidence. In the end, the Plaintiff was simply unable to carry her burden to prove that the Debtor was engaged in a scheme to defraud her.

Judgment will be entered for the Debtor. This Opinion constitutes this Court's findings of fact and conclusions of law made in accordance with Rule 7052(a)(1) of the Federal Rules of Bankruptcy Procedure. A separate Judgment Order will be entered.

#  #  #